Good morning, Your Honors. I'm here for the respondents. And the respondents are present today with their daughters and with extended family members observing the argument today. And I also want to thank the court for Pardon me? You're representing the appellants here today. The petitioners, Your Honor. Petitioners. I'm sorry, did I say respondents? Immigration Court talks. No. I represent the petitioners, Your Honor. Okay. And I also thank the court for permitting me to visit with my family on Monday and being here on Thursday. This is a very compelling case. We believe in family values. I hope that we do, Your Honor, and I hope that we do that for the petitioners are able to benefit from that. It's a very difficult case. The petitioner, Mr. Tampubolon, has been in this country over 20 years and has been an upstanding member of the community and rendering service to us in the hospital for these 20 years. And his wife has also been here almost for that amount of time, 18 years, and also working in health care. And the reason that the respondent is in proceedings is because he was required to register. And his wife decided that she would want to share his fate, so she came forward, applied for asylum, knowing that in all likelihood she would end up in proceedings with her husband, and they would present their cancellation claim together with their asylum and withholding claim. Their daughters right now are, one's going to turn 14, I think, next week, and the other one's 12. And they are totally and absolutely American girls, in addition to being Christian. And their parents are Christian and have always been in their family as Christian as well. Can you point to any individualized persecution that these people suffered? The petitioners have not, Your Honor. I also want to say Mr. Tampubolon was smart. He left before it got really bad. Some of my aunts and uncles left before it was really bad in Hungary, and my parents left after. But I believe, Your Honor, that the claim that we make is about the possibility of future persecution. And we did present very voluminous evidence of the persecution of Christians. I know that you have mentioned today that Christians are a disfavored group. I think after Sile and along, some of the immigration judges have treated Christians who are not Chinese as a disfavored group in hearings that have come up since. What does the record in this case show about the differences, if any, between the treatment of ethnically Chinese Christians and ethnically Indonesian Christians? Well, Your Honor, we prepared the record for the petitioners in that they're Christian. And the record showed, I mean, it didn't distinguish between how are Christian Chinese treated and how are Christians per se treated. Obviously, in Sile and along, the court recognized that, you know, Chinese who are Christian are the ones that are, you know, being Christian is an additional factor for which they're targeted. But the record is very, I'm sorry. They are more identifiable when they're Chinese. Correct. But I think, Your Honor, that, you know, it's the kind of thing, people say, how do they know you're Jewish? You know, but if you were in Germany or in Hungary during World War II or even today, you can be identified as Jewish. So for us, perhaps, and I think the judge acted in the same way, saying that the girls are American, but they're sort of like they're not blue-eyed and blonde Americans, so they're not going to be distinguished. How would Christians be distinguished? They dress differently. They have different rules about what they eat. They don't pray five times a day. You have, you know, cases, in the cases that have been presented to the court, where individuals are going to Christian schools, they're wearing uniforms for Christian schools, so they're identified that way. So I think to the, they may wear crosses. So there's a lot of visible signs. I mean, they may not cover themselves as a traditional Muslim female might or would, you know, in an increasingly religious Indonesia. So to us, you know, it might look like, well, everybody's Indonesian. But I think in point of fact, there are a lot of factors that would show that a person is a Christian. Also, they, you know, may be walking in the street with Bibles. You know, they can be seen attending church, going to church, coming from church. So I think that to the community where they live, they're totally identifiable as Christian people. Now, could they be closet Christians by not going to church and pretending to be Muslims and perhaps covering themselves? Well, I think probably a person could be a closet Christian. But to be a Christian as Mr. Tompipolong and his wife are, who are openly religious, who attend church, who attend services and attend meetings, who teach Sunday school, who are an elder in the church, and who might engage in proselytizing, no, that kind of Christian would be totally visible to the community that they would live in Indonesia. And I think that what occurred in this case to us. Does the record show a pattern or practice of persecution? It does, Ron. I think it shows the targeting of Christians. It also shows that what has occurred in Indonesia is the destruction of a number of churches and increasing, you know, to different historical times. There were, you know, I think the year before the hearing, some 400 churches were destroyed. And what has occurred after the destruction of the churches is that there are no permits being given for new churches to be built. So the net consequence is that you could say officially Christianity is permitted as a religion, but de facto, if there are no places of worship, and I think the record will also show there are no, you're not permitted to work, people that try to worship in homes. You know, like, okay, well, we don't have a church, so let's worship in a home. But people are not permitted to congregate religiously in homes either. So de facto, you're not permitting people to practice their religion. I mean, eventually, you could eliminate all the churches in Indonesia at this rate. And I think that in this case, what occurred is the hearing occurred before this court's decision in Sial and Lelong, and we did argue to the Board of Immigration Appeals that they should consider the disfavored group analysis, and we also argued that it should be considered in the context of a withholding claim. And the judge did not conduct a disfavored group analysis, and the Board, in adopting the judge's decision also, did not address our argument about being a disfavored group and did not address the availability of that for withholding of removal claims. So let's assume for the sake of this question that we agreed with you that the record demonstrates that disfavored group analysis should have applied. Would the correct result be to remand for the agency to consider in the first instance how that applies to your client's case? Yes, Your Honor. It would be our position that under Ventura and under Wakari, yes, this should be remanded, and I think it's distinguishable from Halim in that in Halim, the court noted that the agency had conducted an analysis of disfavored group analysis to some degree, and in our case, that did not happen at all, and we did request that analysis at the board, and then, of course, before this court, we've requested a remand so that the court, so that the agency would consider those arguments. I'll reserve a little bit of time. What about the two girls? The two girls? How do they fit into your analysis? Well, Your Honor, I think the way the two girls fit into the analysis is that the two girls are American. They're American. They're Americanized. They're American born and bred. I'm probably proud of it, and I think when the parents go, they will go as a family unit. They're supported. They're not going to leave the girls here, and they will be the parents of two American girls, and they themselves will be Westernized, which is a point that we raised at the hearing and in our arguments to the board, and then they will have two young American women with them, who A, they'll be obviously two American girls. B, they can cause greater persecution because they will bring attention to themselves, and in particular because they're girls, and as we've seen in some of the treatment of Christians, I mean, women are in particular vulnerable because they're also vulnerable to sexual attack, and so these girls, as Americans and as Christians, will very much be vulnerable, and I think this is a factor that needs to be considered. All right. Thank you. May it please the Court again, Kristen Innocent on behalf of the Attorney General. I think I'll return to the asylum question, and I just wanted to point out petitioners don't have any past persecution claims. They don't have any past persecution claims. Well, but they are still entitled to request withholding, which they have done, and I know that each case stands on its own record, but how does the record in this case compare to the record in the previous case? Isn't it stronger in support of disfavored group analysis? Well, Your Honor, assuming the disfavored group analysis applies, assuming that Christians in Indonesia are a disfavored group, petitioners still have to show that they were. I didn't ask the question very artfully. Is this record stronger in demonstrating that such an analysis ought to apply? That is, does it describe greater difficulties for Christians in Indonesia? Did, Your Honor, is the question whether petitioners might claim? I'm asking about the record and what it shows about how Christians are treated in Indonesia. I believe that this case involves the same country conditions report as the last case, that's the 2002 report. With regard to the additional articles that petitioners submitted, I believe that the records are similar. Even petitioners testified that their family was free to go to church. Petitioners have several family members, all of whom are Christians still living in Indonesia. Again, they testified that their family freely goes to church, although sometimes they had difficulty. They didn't describe that. The petitioner himself said that when he was asked whether he was targeted for being Christian, he said somewhat, a little bit. I think that the fact that petitioners, that Mr. Tanpubulan's nine siblings and mother live in Indonesia and all are Christian, none of them were harmed or threatened. Mr. Tanpubulan's wife has parents and four siblings, all of whom are Christian, living in Indonesia. The State Department reports reflect that the government made progress in promoting religious freedom. I'd refer the Court to pages 396, 458, 449. I think, is that responsive to Your Honor's question? I understand your response. I think as I had began to explain, even if the disfavored group would apply here, petitioners claim that they face any individualized risk. Again, none of their family has been harmed in Indonesia. They don't claim any past persecution. And so, Halim is informative here. That's the case that Petitioner's Counsel mentioned as well. Assuming a pattern in practice exists of persecuting Indonesian Christians, how would that affect them? Your Honor, I don't think petitioners ever raised a pattern or a practice claim. And in any event, recently in Bukhari and then also in Salem, Lolon, the Court held that there was no pattern or practice of Chinese Christians, so it follows that there wouldn't be a pattern of practice of Christians. With respect to Halim, opposing counsel has said that the reason that the petition could be denied in that case was that the agency already had considered disfavored group analysis and come to a conclusion about it. You seem to be asking us to do the same here, but that analysis was never applied. So if we were to conclude that it should have, wouldn't we have to remand under Ventura for that to be looked at in the first instance? And perhaps the decision would be that there was no individualized risk, but how could we decide that? Your Honor, yes, the case would need to be remanded for consideration of the disfavored group analysis. But I don't believe in Halim that the agency had considered it there. And that panel held that remand was not necessary because petitioners made no minimal showing of well-founded fear under that analysis. To even warrant a remand. Counsel, I've been, I read rather carefully the IJ's opinion, and it seemed that he didn't apply the right law in respect to the cap claim. If you look at page 79, it seemed to be that only action by the government could be a cause for the kind of fear that would qualify for the cap claim. But it's much broader than that. If it's a group that were attacking Christians and the government did nothing to control the group, that would constitute grounds for fear that could qualify for cap. You simply didn't apply the right standard there. What should we do about that? Your Honor, respectfully, I didn't think that petitioners raised a cap claim in this case. I thought petitioners, they had their cancellation application and they applied for asylum. Well, the IJ certainly deals with it. In that case, I mean, the case would have to go back to the agency for the application of the correct law. If the court felt that that was the case. Absent any questions from the court, I'm happy to conclude. Thank you again for your time. All right. We've got a little time for, like, a minute or so. Was the cap claim raised? The cap claim was raised, Your Honor. On appeal? It was raised on appeal. Well, that's my question. Did you brief it here? I thought you briefed asylum and withholding. And we also briefed due process. I'm not sure that we briefed cap to this court, Your Honor. I don't recall it, but I can go back and look. I can look at that if the court wishes. I can advise later. But we did raise it at the board, and the judge and the board did decide the cap claim. And then I think, you know, with respect to how we met, I would just reiterate that I think that the analysis that is required was not performed, you know, by the agency, and we would request a remand on that basis. Thank you. What does the petition say about cap claim? If I may have a minute, Your Honor? Yeah. The brief did not address the cap claim. I need to look at our petition itself. It probably mentioned the fact that all relief was denied. That would have included the cap claim. You see, I have a note here that IJ denied petitioner's application for relief under cap because they had not demonstrated that the Indonesian government was actively pursuing Christians, practicing Christianity. Well, no, there's no question it was decided below. My question was whether it was raised as a separate issue in this court, and I didn't see it having been so raised. We did not raise it in the brief, Your Honor. Okay. Okay. Thank you. Thank you very much. All right. Let's take care of that matter. And now we'll go back to chamber versus United States. Richard has been submitted on the brief. Yes, here it is here.
judges: Fletcher B. , Pregerson, Graber